**J. H. BAUMANN and Marguerite Marie Jacobson, Plaintiffs,**

v.

**Robert V. SMRHA, as Chief Engineer of the Division of Water Resources of the Kansas State Board of Agriculture, Defendant,**

**and**

**City of Wichita, Kansas, Intervener.**

**Civ. A. No. T–1228.**

United States District Court
D. Kansas.

April 30, 1956.

Kenneth G. Speir, Vernon A. Stroberg, Herbert H. Sizemore, and Richard F. Hrdlicka, Newton, Kan., for plaintiffs.

Harold R. Fatzer, Atty. Gen., for the State of Kansas.

Paul E. Wilson, Asst. Atty. Gen., and Warden L. Noe, Sp. Asst. Atty. Gen., for defendant.

Fred W. Aley, Robert B. Morton, and Paul J. Donaldson, Wichita, Kan., for intervenor, City of Wichita, Kan.

Daniel R. Hopkins, Garden City, for Finney County Water Users Ass'n, South Side Irr. Co., Kearny County Farmers Irr. Ass'n, Garden City Ditch Co., United States Irrigating Co., and Earl C. Brookover, amici curiæ.

Arno Windscheffel, Smith Center, Kan., for Kirwin Irr. Dist., amicus curiæ.

N. J. Ward, Belleville, Kan., for Kansas Bostwick Irr. Dist., amicus curiæ.

Before HUXMAN and PHILLIPS, Circuit Judges, and MELLOTT, District Judge.

PHILLIPS, Circuit Judge.

This action was instituted on August 16, 1955, in the above court, by J. H. Baumann and Marguerite Marie Jacobson, plaintiffs, under the provisions of 28 U.S.C. §§ 1331, 2201, 2281 and 2284, against Robert V. Smrha, defendant, Chief Engineer of the Division of Water Resources of the Kansas State Board of Agriculture. This action arises under the Fourteenth Amendment to the Constitution of the United States.

The action was brought for the purpose of obtaining a declaratory judgment that the Kansas Water Appropriation Act of 1945, G.S.1949, Ch. 82a, Art. 7, hereinafter referred to as the Act, violates the Fourteenth Amendment to the Constitution of the United States, and is, therefore, null and void; for an injunction restraining the defendant from enforcing, operating under, or executing said Act; and requiring defendant to revoke and nullify any and all permits, vested right orders, or other actions and decisions heretofore taken or entered by him under or pursuant to said Act. On September 9, 1955, an order was entered in the case, constituting a three-judge court. On September 10, 1955, the defendant filed a motion to quash the summons and dismiss the action on the grounds: (1) the court does not have jurisdiction of the defendant: (2) that the court does not have jurisdic-

tion of the subject matter of the action; and (3) that the complaint does not state a cause of action. On October 13, 1955, the City of Wichita, Kansas, hereinafter referred to as the City, with the leave of court, intervened in the action and filed an answer. Pursuant to an order entered on September 26, 1955, a hearing was had before the three-judge court on October 21, 1955. At this hearing it was agreed that the court would not attempt to adjudicate any liability of the City to the plaintiffs. Certain irrigation districts and Earl C. Brookover were granted leave to file briefs as "friends of the Court" in support of the defendant's position that the statute is valid. The Committee of Kansas Farm Organizations was also granted leave to file a brief as a "friend of the Court" in support of plaintiffs' contention. Certain facts were stipulated and certain exhibits were introduced in evidence. The parties then agreed in open court that there no longer remained any controverted issue of fact and both plaintiffs and defendant orally moved for summary judgment.

The motions for summary judgment were orally argued. Written briefs have been filed and the motions now stand submitted.

The material facts are as follows:

The plaintiff, J. H. Baumann, is the life tenant, and the plaintiff, Marguerite Marie Jacobson, is the remainder owner of the fee title to certain lands situated in Harvey County, Kansas, on the south boundary line of said county, three miles west and two miles north of the Town of Bentley; to wit, the southwest quarter of Section 32, Township 24 South, Range 2 West of the Sixth Principal Meridian. The title to such lands, now owned by plaintiffs, passed from the United States into private ownership during the year 1880 and the plaintiff, Baumann, acquired it in 1930.

Such lands are located in what is known as the "Equus Beds," a geological formation containing water of a quantity suitable for domestic, municipal, irrigation, and other purposes. The Equus

Beds is a ground water reservoir composed of extremely permeable gravel and sand, occupying the channel of an ancestral Smoky Hill River, which flowed into an ancestral Arkansas River. Such Beds cover an area extending approximately 55 miles north and south between Wichita and Lindsborg and approximately 25 miles east and west and located principally in the Counties of Sedgwick, Harvey, and McPherson, in the State of Kansas. The ground water within the reservoir moves generally toward the Little Arkansas River, except in the northern part, where there is a movement toward the Smoky Hill River. There has been and now is a "draw-down" of the water table under plaintiffs' lands. Such Beds provide natural sub-irrigation for plaintiffs' lands and plaintiffs have been and are using Equus Beds water for domestic purposes.

It has been estimated on the basis of test drilling that the part of this ground water reservoir between the Towns of McPherson and Valley Center contained millions of acre feet of water in storage under natural conditions. This ground water is recharged chiefly by direct precipitation. Detailed studies made from 1938 to 1944 showed that most of the natural discharge from the ground water reservoir occurred by evapotranspiration in areas where the depth of water was less than 20 feet.

In 1940, the City acquired by purchase for municipal water supply 25 five-acre well sites in Harvey County, located three to ten miles east and northeast of plaintiffs' lands and thereafter the City purchased other well sites. Thereafter, the City drilled and equipped water wells thereon and commenced pumping water therefrom for use by the inhabitants of the City and its environs. The water levels of the Equus Beds have declined since the City drilled wells in 1940 and the water table might have declined as much as four feet without pumping, because of drought, but the rest of the decline must be attributed to pumping, chiefly by the City.

At present there are more than 200 water wells in addition to the City's wells that are located in the general area of plaintiffs' lands, at least 14 being located nearer to plaintiffs' lands than any of the City's wells. Since 1945, the operations of the City and others, pursuant to certain permits and orders issued by the defendant, have withdrawn and are withdrawing water from the Equus Beds.

The defendant is the duly appointed, qualified and acting Chief Engineer of the Division of Water Resources of the Kansas State Board of Agriculture, and is the official charged with certain duties and authorities in connection with the administration of the Act.

By reason of the operations of the City, pursuant to said permits and orders of defendant, plaintiffs' lands have been affected to a considerable extent and will continue to be more seriously affected if said City is permitted to continue to withdraw water from under plaintiffs' lands. From January, 1952, to October 1, 1954, the water table under plaintiffs' lands declined approximately four feet. From October 1, 1954, to July 1, 1955, the water table level under plaintiffs' lands and other lands in the same general area remained almost constant. The water table under all lands in the same general area similarly declined.

The Kansas legislature has taken cognizance of apparent damages to landowners by reason of granting permits for appropriating water for beneficial use and of questions of the constitutionality of the Act, arising because of inadequate provisions as to notice to and for compensation of landowners and persons owning vested water rights. The Kansas Legislative Council reported that procedural aspects of the Act needed correction to insure notice and hearing.

The people who depend upon the Equus Beds for water have the immediate problems which accompany increasing use of any reservoir—water holes have gone dry, shallow wells have been deepened, many wells now obtain water of poorer quality, and some crops have undoubtedly been reduced in area where the water

table was once near enough to the surface to be reached by the plants.

At the end of 1951, the water table was higher throughout the well-field area than at the end of 1954, and at the end of that wet year, it was significantly lower than in 1940, throughout an area of 45 square miles, and the decline exceeded 10 feet in an area of 11 square miles, and in certain locations 20 feet. This area of depression had been expanding and deepening ever since pumping began in 1940, partly because of the progressive increase in pumpage from 1940 to 1951.

Plaintiffs' land is located in the City's proposed and pending well-field application for 25,000 additional acre feet of water per year.

■ It is alleged in the complaint that the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs. On motion for summary judgment, that allegation stands admitted,[1] and it does not affirmatively appear from the complaint that the value of the right which the plaintiffs seek to protect does not exceed $3,000, exclusive of interest and costs.

The Act, in part, reads as follows:

"82a–701. Definitions. When used in this act the following words shall have the following respective meanings:

"(a) 'Person' shall mean and include a natural person, a partnership, an organization, a corporation, a municipality and any agency of the federal government.

"(b) 'Chief engineer' means the chief engineer of the division of water resources of the Kansas state board of agriculture.

"(c) 'Domestic uses' means the use of water for household purposes, the watering of livestock, poultry, farm and domestic animals and the irrigation of gardens and lawns.

"(d) 'Vested right' means the right to continue the use of water having actually been applied to any beneficial use at the time of the passage of this act or within three years prior thereto to the extent of the existing beneficial use made thereof, and shall include the right to take and use water for beneficial purposes where a person is engaged in the construction of works for the actual application of water to a beneficial use at the time of the passage of this act, provided such works shall be completed and water is actually applied for such use within a reasonable time thereafter.

"(e) 'Appropriator' means and includes a person who obtains a permit from the chief engineer authorizing him to divert and apply an alloted quantity of water for a designated beneficial use and who makes actual use of the water for such purpose.

"(f) 'Appropriation' means and includes an amount of water authorized and allotted by the chief engineer for a designated beneficial purpose within specific limits as to quantity and rate of diversion and withdrawal.

"82a–702. Dedication of use of water. All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein prescribed.

"82a–703. Water may be appropriated subject to vested rights. Subject to vested rights, all waters within the state may be appropriated for beneficial use as herein provided. Nothing in this act contained shall impair the vested right of any person except for nonuse.

"82a–704. Order establishing rights of persons making beneficial

1. Safeway Stores v. Wilcox, 10 Cir., 220 F.2d 661; Harris v. Railway Express Agency, 10 Cir., 178 F.2d 8; Furton v. City of Menasha, 7 Cir., 149 F.2d 945, certiorari denied 326 U.S. 771, 66 S.Ct. 176, 90 L.Ed. 466.

use of waters as of June 28, 1945; notice; time for appeals to district court. As soon as practicable after the passage of this act, the chief engineer or his authorized representatives shall proceed with the necessary steps to gather data and other information as may be essential to the proper understanding and determination of the vested rights of all parties using water for beneficial purposes other than domestic. Such observations and measurements shall be reduced to writing and made a matter of record in his office.

"The chief engineer shall then make an order determining and establishing the rights of all persons making beneficial use of water on the effective date of this act and the then extent of their uses and shall notify all such work [water] users as to the contents of such order. Service of such notice shall be deemed complete upon depositing such notice in the post office as registered mail addressed to such water user at his last known post-office address. The order of determination of the chief engineer shall be in full force and effect from the date of its entry in the records of his office unless and until its operation shall be stayed by an appeal therefrom by such user to the district court of the county in which the point of diversion of such use is located. All such appeals from the order of the chief engineer must be filed within sixty days after posting and mailing of the notice of such order of determination.

"82a–705. Permit to acquire an appropriation right to water. No person shall have the power or authority to acquire an appropriation right to water without first obtaining the approval of the chief engineer: *Provided, however,* That this section shall not apply to persons using water for domestic uses.

"82a–706. Duties of chief engineer as to rights of priority of appropriation. The chief engineer is hereby authorized and empowered, and it is hereby made the duty of such officer, to control, conserve, regulate and allot the water resources of the state for the benefits and beneficial uses of all of its inhabitants in accordance with the rights of priority of appropriation.

"82a–707. Principles governing appropriations. (a) Surface or ground waters of the state may be appropriated as herein provided. Such appropriation shall not constitute absolute ownership of such water, but shall remain subject to the principle of beneficial use. (b) Where appropriations of water for different purposes conflict they shall take precedence in the following order, namely: Domestic, municipal, irrigation, industrial, recreational and water power uses. (c) As between appropriators, the first in time is the first in right. The priority of the appropriation shall date from the time of the filing of the application therefor in the office of the chief engineer. (d) Appropriation in excess of the reasonable needs of the appropriators shall not be allowed.

"82a–708. Determination of priorities of right of applicants for permits; appeals. The chief engineer shall determine the priorities of right to the use of the waters of the state, as to all persons who have since May 5, 1941, and who shall hereafter make application for a permit or certificate to divert, appropriate and use water. An appeal may be taken from any decision or order of the chief engineer to the district court in the county of his official residence or in the county in which the point of diversion is located. All such appeals must be filed within thirty days after date of such decision or order."

Section 82a–709 provides that every person intending to acquire an appropriation right to any of the waters of the State for beneficial use, other than domestic, may do so by making an application to the Chief Engineer for a permit to make such appropriation. It enumerates what shall be set forth in the application.

Section 82a–710 provides that upon the receipt of the application, the Chief Engineer shall endorse thereon the date and assign a number thereto.

Section 82a–711 provides that it shall be the duty of the Chief Engineer to approve all applications made in proper form which contemplate the utilization of water for beneficial purposes, provided the proposed use does not conflict with an existing use, and provided the proposed use does not prejudicially and unreasonably affect the public interest. It does not provide for any notice to third persons whose rights may be adversely affected by the appropriation of water by the permittee.

Section 82a–716 provides:

"Common law claimants; action for compensation; injunctions by appropriators. If any appropriation, or the construction and operation of authorized diversion works results in an injury to any common-law claimant, such person shall be entitled to due compensation in a suitable action at law against the appropriator for damages proved for any property taken. An appropriator who has acquired a valid right under this statute may prevent, by injunction, a subsequent diversion by a common-law claimant of private rights without being required to first condemn possible private rights. An appropriator shall have right to injunction relief to protect his prior right of beneficial use as against use by an appropriator with a later priority of right."

Section 82a–717 provides:

"Beneficial purpose; termination for nonuse. All appropriations of water must be for some beneficial purpose. The right of the appropriator and his successors to the use of water shall terminate when he ceases for three years or more, to use it for the beneficial purposes authorized in his permit or certificate."

Whether this is an action against the State depends upon whether the challenged Act is constitutional. If it is unconstitutional, the Chief Engineer is acting as an individual and not as an agent or instrumentality of the State.

In the recent case of Georgia Railroad & Banking Co. v. Redwine, 342 U.S. 299, 304, 305, 306, 72 S.Ct. 321, 324, 96 L.Ed. 335, the court said:

"This Court has long held that a suit to restrain unconstitutional action threatened by an individual who is a state officer is not a suit against the State.

\* \* \* \* \* \*

"Since appellant seeks to enjoin appellee from a threatened and allegedly unconstitutional invasion of its property, we hold that this action against appellee as an individual is not barred as an unconsented suit against the State. The State is free to carry out its functions without judicial interference directed at the sovereign or its agents, but this immunity from federal jurisdiction does not extend to individuals who act as officers without constitutional authority.

"Accordingly, we find that the District Court was not deprived of jurisdiction in this case on either the ground that it is a suit against the State \* \* \*."

Prior to the enactment of the Act, the Supreme Court of Kansas in many decisions had recognized the applicability in Kansas of the doctrine of riparian rights. In State ex rel. Peterson v. Kansas State Board of Agriculture, 158 Kan. 603, 149 P.2d 604, at page 608, the court said:

"Under the above authorities underground waters are part of the

real property in which they are situated. The owner of land may convey or grant the underground water, or the right to take it from the land, by an appropriate instrument in writing to the same extent that he might convey or grant any other portion of the real property; or a party, having the right of eminent domain, may appropriate underground water to his use by condemnation proceedings."

However, in the subsequent case of State ex rel. Emery v. Knapp, 167 Kan. 546, 207 P.2d 440, at page 447, the court, in construing the Act here in question, in part, said:

"We next observe that no complaint is made of section 702, which declares: 'All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein prescribed.'

"This is the heart of the statute. The rest of it treats of details and procedure. It forms the basis for a different approach to the solution of questions concerning water rights than we have had in some of our opinions. Heretofore we have approached the questions largely on the basis of individual interest alone. Under this declaration and other provisions of the act we now approach them upon the basis of the interest of the people of the state without losing sight of the beneficial use the individual is making or has the right to make of the water. Unused or unusable rights predicated alone upon theory become of little if any importance. Broad statements found in some of our opinions, such as 'every man through whose land a stream of water runs is entitled to the flow of that stream without diminution or alteration' Shamleffer v. Council Grove Peerless Mill Co., 18 Kan. 24, must be disregarded or modified to harmonize with this declaration. The change is an appropriate one for the legislature to make. Individuals do not live alone in isolated areas where they, at their will, can assert all of their individual rights without regard to the effect upon others."

It should be observed that the Act recognizes and affords protection to vested rights. Section 82a–704 provides for the determination of such rights by the Chief Engineer and for a review of his action by appeal to the appropriate state district court. Section 82a–708 provides for the determination of priorities of rights of applicants for permits by the Chief Engineer and for a review of his determinations by appeal to the appropriate state district court.

It is true that the Act does not provide for notice to persons, who may be adversely affected by the granting of a permit, of the hearing or of the action by the Chief Engineer upon applications for permits. However, permits are necessarily granted subject to valid existing vested rights and to prior appropriations, and provision for the protection of those rights, either by actions for damages or for injunction, is carefully made by Sections 82a–712 and 82a–716.

■ The power of a state either to modify or reject the doctrine of riparian rights because unsuited to the conditions in the state and to put into force the doctrine of prior appropriation and application to beneficial use or of reasonable use has long been settled by the adjudicated cases.[2]

■ Of course, such a modification in the law of the state must recognize valid existing vested rights, but we do not regard a landowner as having a vested right

2. Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236; Murphy v. Kerr, D.C.N.M., 296 F. 536. See, also, Bassett v. Salisbury Mfg. Co., 43 N.H. 569; Meeker v. City of East Orange, 77 N.J.L. 623, 74 A. 379, 25 L.R.A., N.S., 465; Erickson v. Cookston Waterworks, Power & Light Co., 100 Minn. 481, 111 N.W. 391, 9 L.R.A.,N.S., 1250.

in underground waters underlying his land which he has not appropriated and applied to beneficial use.[3]

■ We hold that the state could properly apply the doctrine of prior appropriation and application to beneficial use to unused and unappropriated waters so long as it recognized and afforded protection to rights which landowners had acquired at the time of the effective date of the Act to appropriate and use water.

Whether such a change in the law of Kansas is contrary to earlier decisions of the Supreme Court of Kansas, it is cognizant with the latest decision of the Supreme Court of Kansas in State ex rel. Emery v. Knapp, 167 Kan. 546, 207 P.2d 440, which must be regarded as having overruled the earlier cases.

■ There is no vested right in the decisions of a court and a change of decision does not deprive one of equal protection of the laws or property without due process of law.[4]

■ Even though prior decisions of a state court have established a rule of property, a departure therefrom in a subsequent decision does not, without

more, constitute a deprivation of property without due process of law under the Fourteenth Amendment.[5]

■■ The Fourteenth Amendment in guaranteeing equal protection of the laws does not assure uniformity of judicial decisions or immunity from judicial error.[6] Likewise, it is well settled that a legislature may change the principle of the common law and abrogate decisions made thereunder when in the opinion of the legislature it is necessary in the public welfare.[7]

■ Adequate water supply is a necessity. In the arid and semi-arid regions of the West it is imperative that all available water be utilized beneficially and without waste. The accomplishment of those ends is well within the competency of the legislature.

Plaintiffs have not seen fit to invoke the remedies afforded them by the Act. Those remedies are adequate, we think, to afford protection to any vested rights of the plaintiffs.

■ We conclude that the Act is constitutional.

3. Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 771, 64 L.R.A. 236.

4. Sunray Oil Co. v. Commissioner, 10 Cir., 147 F.2d 962, 963, certiorari denied 325 U.S. 861, 65 S.Ct. 1201, 89 L.Ed. 1982; Cooper v. Commissioner, 4 Cir., 197 F.2d 951, 953; Carolina-Virginia Racing Ass'n v. Cahoon, 4 Cir., 214 F.2d 830, 832.

5. O'Neil v. Northern Colorado Irrigation Co., 242 U.S. 20, 26, 27, 37 S.Ct. 7, 61 L.Ed. 123.

6. Milwaukee Electric R. & Light Co. v. State of Wisconsin ex rel. City of Milwaukee, 252 U.S. 100, 106, 40 S.Ct. 306, 64 L.Ed. 476; Riley v. Worcester Coun-

ty Trust Co., 1 Cir., 89 F.2d 59, 66, affirmed 302 U.S. 292, 58 S.Ct. 185, 82 L. Ed. 268.

7. United States v. United Shoe Machinery Co., 8 Cir., 264 F. 138, 151, appeal dismissed 254 U.S. 666, 41 S.Ct. 217, 65 L.Ed. 465, affirmed 258 U.S. 451, 42 S. Ct. 363, 66 L.Ed. 708, rehearing denied 259 U.S. 575, 42 S.Ct. 585, 66 L.Ed. 1071; Silver v. Silver, 280 U.S. 117, 50 S.Ct. 57, 74 L.Ed. 221; Shea v. Olson, 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998; Pringle v. Gibson, 135 Me. 297, 195 A. 695, rehearing denied 135 Me. 512, 197 A. 553; Komorowski v. Boston Store of Chicago, 341 Ill. 126, 173 N.E. 189.